UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DWAYNE D.,[1] | ) |
|           Plaintiff, | ) No. 21 CV 149 ) ) |
| v. | ) Magistrate Judge Young B. Kim ) |
| KILOLO KIJAKAZI, Commissioner of Social Security, | ) ) ) ) October 23, 2023 |
|           Defendant. | ) |

**MEMORANDUM OPINION and ORDER**

Dwayne D. seeks disability insurance benefits ("DIB") asserting that he is disabled by various medical conditions, including diabetes, obesity, neuropathy, retina disorder, back and shoulder pain, and sleep apnea. He brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security denying his DIB application. Before the court are cross-motions for summary judgment. For the following reasons, Dwayne's motion is denied, and the government's is granted:

**Procedural History**

Dwayne filed a DIB application on March 1, 2017, alleging disability beginning on the same date. (Administrative Record ("A.R.") 24.) At the administrative level, his application was denied initially and upon reconsideration. (Id.) Dwayne appeared with his attorney at his October 2018 hearing before an Administrative Law Judge ("ALJ"), and he and a vocational expert ("VE") testified.

---

[1] Pursuant to Internal Operating Procedure 22, the court uses Plaintiff's first name and last initial in this opinion to protect his privacy to the extent possible.

(Id.) The ALJ then ruled in January 2019 that Dwayne is not disabled. (Id. at 33.) The Appeals Council denied Dwayne's request for review, (id. at 5), making the ALJ's decision the final decision of the Commissioner, *see Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir. 2019). Dwayne then filed this lawsuit seeking judicial review, and the parties consented to this court's jurisdiction. *See* 28 U.S.C. § 636(c); (R. 10).

## Analysis

Dwayne argues that the ALJ erred by: (1) improperly discounting Dwayne's subjective complaints of pain; (2) "rely[ing] on his own inaccurate, lay assessment of objective medical evidence" when rejecting the treating physician's opinion and failing to "identify specific, legitimate reasons for doing so"; and (3) failing to adequately explain how he assessed Dwayne's RFC. (R. 23, Pl.'s Br. at 8.) When reviewing the ALJ's decision, the court asks only whether the ALJ applied the correct legal standards and the decision has the support of substantial evidence, *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019), which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quotation and citations omitted). This deferential standard precludes the court from reweighing the evidence or substituting its judgment for the ALJ's, allowing reversal "only if the record compels" it. *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021) (quotation and citation omitted). However, the ALJ must "provide a 'logical bridge' between the evidence and his conclusions." *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021).

Put another way, the ALJ's "analysis must say enough to enable a review of whether the ALJ considered the totality of a claimant's limitations." *Lothridge v. Saul*, 984 F.3d 1227, 1233 (7th Cir. 2021). Having considered the parties' arguments and the record, the court concludes that the ALJ supported his decision with substantial evidence.

A. **Subjective Symptoms**

Dwayne argues that the ALJ erred in finding that "the record did not reflect that [his] left shoulder, lumbar spine, diabetes, neuropathy, sleep apnea, hypertension, or retinal disorder were as limiting as he alleged." (R. 23, Pl.'s Br. at 14.) When assessing a claimant's subjective reports, an ALJ considers objective medical evidence, daily activities, frequency and intensity of symptoms, medications, and treatment to relieve pain or other symptoms, and functional limitations. *See* SSR 16-3p, 2017 WL 5180304, at *7-8 (Oct. 25, 2017); 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). An ALJ's symptom evaluation generally is entitled to great deference because the ALJ observed the claimant's credibility firsthand. *See Murphy v. Colvin*, 759 F.3d 811, 815 (7th Cir. 2014). As such, a court will not disturb a symptom evaluation if it is based on specific findings and evidence and not "patently wrong"—that is, so long as it does not "lack[] any explanation or support." *Id.* at 815-16 (citing *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008)); *see also Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013).

The ALJ acknowledged the treatment Dwayne received for his shoulder pain from his primary care physician and during an emergency room visit in May 2018,

3

and he discussed the diagnostic imaging showing "degenerative changes of the shoulder" but "[n]o evidence of acute fracture or dislocation." (A.R. 29.) Ultimately, though, the ALJ found that Dwayne's claim of debilitating shoulder pain was not credible because he only received injections to treat the pain and had the condition monitored by his primary care physician rather than an orthopedic specialist. (Id.) The ALJ also found that Dwayne's lack of inpatient hospitalization and additional emergency room visits undermined his claims of debilitating pain. (Id.)

As for Dwayne's spinal condition, the ALJ noted that: "[d]iagnostic imaging reveals no more than moderate findings"; a neurosurgeon with whom Dwayne consulted about this condition did "not feel that there are any indications for surgical interventions at this time"; and his pain "is most likely amenable to conservative treatment with physical therapy, and possibly steroid injections." (Id. (citing id. at 498, 688, 719).) Additionally, he noted that Dwayne's primary care physician recorded normal gait, strength, muscle tone, and reflexes during physical examinations. (Id. (citing records).)

Although conservative care for a condition may support a conclusion that a claimant's condition is not as serious as alleged, an ALJ may not rely on conservative care to discount a claimant's testimony when "the treatments he or she received did not work." *Juanona N. v. Saul*, No. 19 CV 4110, 2021 WL 1614504, at *7 (N.D. Ill. April 26, 2021) (citing *Geer v. Berryhill*, 276 F. Supp. 3d 876, 887 (E.D. Wis. 2017); *Pickup v. Colvin*, 606 Fed. Appx. 430, 433 (10th Cir. 2016)). Relatedly, an adverse credibility finding based upon a claimant's failure to follow prescribed or

4

recommended treatment cannot be upheld if the claimant had "good reason for the failure." *Joseph M. v. Saul*, No. 18 CV 5182, 2019 WL 6918281, at *10 (N.D. Ill. Dec. 19, 2019). Here, Dwayne's course of treatment was complicated by his diabetes and his status as a recovering drug addict. Although he received sporadic injections for shoulder pain, Dwayne testified that steroid injections caused problems with his diabetes, as did taking gabapentin to treat his neuropathic symptoms, because they caused significant weight gain. (A.R. 55, 57.) Further, although he was prescribed pain medications and muscle relaxants to ease his pain, Dwayne shared during the hearing that he is a drug addict who has been sober for 13 years. (Id. at 55.) Given his struggle with addiction, he takes medication only when his pain "begins to feel overbearing," but otherwise avoids prescription medication for his pain. (Id. at 66.) He explained, "I really endure more pain than I probably should because I don't like getting too comfortable taking drugs." (Id. at 55.)

Dwayne's commitment to sobriety and discipline in managing his pain cannot be easy, and it would be inappropriate for an ALJ to ignore this reason for avoiding pain medications. Although the ALJ mentioned these points when summarizing the record evidence, he did not explain how they affected his view of Dwayne's credibility as to the severity of his pain symptoms, which is problematic. That said, the court notes that Dwayne did not pursue physical therapy to address his pain despite having received referrals for twice-a-week sessions over the course of eight weeks from both his primary care physician, (see id. at 530, 535), and a neurologist evaluating his back pain and radiculopathy, (id. at 688). During his hearing,

5

Dwayne testified that he did not pursue physical therapy because "no one ever followed up on that." (Id. at 55.)

"An ALJ errs in relying on conservative treatment if the record does not reflect that more aggressive treatment options are appropriate or available." *Juanona N.*, 2021 WL 1614504, at *7 (citing *Corless v. Comm. of Soc. Sec. Admin.*, 260 F. Supp. 3d 1172, 1176 (D. Ariz. 2017)). Regarding his lower back pain, a neurologist determined that surgical intervention was not appropriate in November 2017 based on MRI results, which show degenerative changes in the lumbar spine with mild disk bulging at the L4-5, L5-S1 levels and mild-to-moderate foraminal stenosis. (A.R. 688.) Although surgery was not recommended, physical therapy was, but Dwayne chose not to pursue that course of treatment because, he says, his providers did not tell him at later appointments that he should attend. (Id. at 55.) The ALJ did not err in finding that this evidence suggests that Dwayne's shoulder and back pain—the ailments for which physical therapy was prescribed—were not as debilitating as he asserted. Because an ALJ need only assert a single valid reason to support his credibility assessment, the ALJ's analysis here is not patently wrong. *See Kittelson v. Astrue*, 362 Fed. Appx. 553, 558 (7th Cir. 2010) (despite finding ALJ's adverse credibility opinion to be "not perfect," Seventh Circuit held that single discrepancy between what claimant alleged and what doctors recorded in treatment notes "provided a sufficient basis for the ALJ's adverse credibility determination").

Next, Dwayne complains that the ALJ improperly discounted the severity of his sleep deprivation claims when he relied on Dwayne's sleep-study conclusions, which found that the use of a BiPAP machine "improved significantly" Dwayne's sleep quality. (A.R. 30 (citing id. at 256).) Dwayne states that the report upon which the ALJ relied concerns only "improved sleep architecture and fragmentation *during the sleep study*," and Dwayne "testified that his sleep has not significantly improved with his machine" at home. (R. 23, Pl.'s Br. at 14 (emphasis in original).) This may be true, but any error committed here is harmless because the ALJ's RFC specifically accommodates Dwayne's sleep apnea by limiting him to "never climbing ladders, ropes, and scaffolds and never working around dangerous machinery with moving mechanical parts," and Dwayne fails to articulate any further limitation required to accommodate this condition. *Gedatus v. Saul*, 994 F.3d 893, 905 (7th Cir. 2021) (citing *Jozefyk*, 923 F.3d at 498).

Dwayne also argues that the ALJ improperly discounted the severity of his vision-related symptoms. (R. 23, Pl.'s Br. at 15.) He states that although his vision improved after receiving intravitreal injections in his right eye, and he has not required additional surgery post-cataract removal, the ALJ "ignored that [his] vision has not improved since his cataract removals and that he still has symptoms such as sensitivity to sunlight." (R. 23, Pl.'s Br. at 15; see also A.R. at 432.) The ALJ did not mention Dwayne's testimony that when he reads, he cannot perceive each letter in sentences, and that although the injections "slowly work," he "[does not] see a strong visible change [him]self." (A.R. 61.) Nor did the ALJ address

7

records from Dwayne's ophthalmologist evidencing his light sensitivity and "shakey" vision even after the injections and cataract surgeries in his decision. (Id. at 632.) ALJs are not vested with the power to ignore lines of evidence, and doing so here was erroneous. *See Gedatus*, 994 F.3d at 901. However, this error is also harmless because the ALJ provided restrictions to accommodate Dwayne's vision issues—namely that he "can never operate a motor vehicle as part of his work-related duties and is limited to tasks that only require occasional near visual acuity"—and Dwayne again fails to articulate what further accommodation is necessary. (A.R. 30.) As such, a remand is not required on this ground.

**B.    Opinion Evidence**

Dwayne argues that the ALJ erred by assigning "little weight" to his primary care physician Dr. William Gillard's opinion. (R. 23, Pl.'s Br. at 8.) Dr. Gillard opined that the symptoms associated with Dwayne's bilateral foraminal stenosis and chronic low back pain were severe enough to "constantly" "interfere with the attention [and] concentration required to perform simple work-related tasks." (A.R. 501.) He indicated that Dwayne would "need to recline or lie down during a hypothetical 8-hour workday" in excess of regular breaks afforded. (Id.) He also noted that Dwayne could walk only half a block before resting or having significant pain, could sit only 2 hours of an 8-hour workday, could stand or walk only 1 hour of an 8-hour workday, and needs two to three 10-15 minute breaks each hour while working. (Id.) He further opined that, during an 8-hour workday, Dwayne could use his hands for grasping, turning, and twisting, and fine manipulation for 48

8

minutes, and use his right arm for reaching for 48 minutes, but could never use his left arm for reaching. (Id.) Dr. Gillard's opinion did not include references or citations to medical records or diagnostic tests, (see id. at 501-02), although Dwayne argues that because the assessment lists the diagnosis listed in the MRI report, the opinion is grounded in that report, (R. 23, Pl.'s Br. at 10). The ALJ found Dr. Gillard's "extreme limitations" inconsistent with his treatment notes, which "reflect[ed] normal gait and station with normal bilateral motor strength and no edema." (A.R. 31.) Further, the ALJ found that Dr. Gillard's opinion lacked support from diagnostic imaging, which showed only "mild degenerative changes to the lumbar spine." (Id.)

A treating physician's opinion in cases filed before March 27, 2017—which is the case here—is generally entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence." *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (internal quotation and citation omitted). However, "once well-supported contradicting evidence is introduced," the treating physician's opinion "becomes just one more piece of evidence for the ALJ to consider." *Bates*, 736 F.3d at 1099-1100 (internal quotation and citation omitted); *Ray v. Saul*, 861 Fed. Appx. 102, 105 (7th Cir. 2021) (citation omitted). The Seventh Circuit "uphold[s] all but the most patently erroneous reasons for discounting a treating physician's assessment," *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015) (internal quotation and citation omitted), so long as the ALJ "minimally articulated his reasons—a very

9

deferential standard," *Elder v. Astrue*, 529 F.3d 408, 418 (7th Cir. 2008) (citation omitted).

Dwayne argues that the ALJ's opinion assessment was flawed because the ALJ ignored Dr. Gillard's examination findings regarding Dwayne's pain, limited range of motion, knee and ankle reflex issues, and tenderness at palpation of the back, among other issues, and instead referenced only Dr. Gillard's findings of normal gait and strength. (R. 23, Pl.'s Br. at 9.) But the ALJ discussed all of these symptoms, albeit outside of his summary of the medical record. (See A.R. 29.) Indeed, the ALJ stated during his analysis of Dwayne's shoulder pain that: his "primary care physician noted approximately fifty percent loss of range of motion and impingement" in his shoulder; he received emergency department treatment for pain in his left shoulder; diagnostic imaging performed at the emergency department shows "[n]o evidence of acute fracture or dislocation" but did reveal "degenerative changes of the shoulder"; he was to treat his shoulder pain with injections; and he was diagnosed with an incomplete rotator cuff tear of the left shoulder. (Id.) Discussing this evidence during the symptom assessment is sufficient because an ALJ need not repeat an analysis previously made at each step of the analysis. *See Orlando v. Heckler*, 776 F.2d 209, 213 (7th Cir. 1985) ("We agree it would be more helpful if the [ALJ's] determination[] and supporting reasoning also appeared in the Findings section, but refuse to impose such a needless formality."). While it is true that the ALJ failed to mention Dwayne's tenderness at palpation of the back and his positive straight-leg tests, ALJs need

10

not discuss every piece of evidence in the medical record so long as they "articulate some legitimate reason" for the finding. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000) (citing *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994)).

Moreover, other evidence upon which the ALJ relied—including the results of an October 2017 MRI and an October 2017 electromyography ("EMG") study—speaks to Dwayne's back pain and related issues and supports the ALJ's conclusions. (See A.R. 491-500.) Dwayne asserts that the ALJ misinterpreted the findings reflected in both reports, inappropriately describing the resulting diagnoses as "mild." (R. 23, Pl.'s Br. at 9.) But the ALJ noted that "[d]iagnostic imaging reveals no more than moderate findings," citing the October 2017 MRI report at issue. (A.R. 29.) The radiology report accompanying the MRI results similarly concludes:

> There is mild generalized disc annular bulging and mild bilateral degenerative facet hypertrophy at L4-5 which causes moderately severe, symmetric bilateral foraminal stenosis. (2) There is minimal generalized disc bulging and moderate right and mild left degenerative facet hypertrophy which causes moderate bilateral foraminal stenosis at L5-S1.

(Id. at 498.) And the neurologist found that "[a]fter review of his MRI, we do not feel that there are any indications for surgical intervention" and that the condition "is most likely amenable to conservative treatment with physical therapy, and possible steroid injections." (Id. at 688.) Furthermore, the ALJ flagged the October 2017 EMG report in his analysis, that it noted "an abnormal study of the legs . . . [with] electrophysiological evidence for a moderate chronic L4-S1 radiculopathy" and "evidence for a superimposed sensory neuropathy." (Id. at 29.) This report was

11

also considered by the neurologist during Dwayne's November 2017 consultation, and it contributed to his finding that conservative treatment would adequately treat Dwayne's condition. (See id. at 688.)

These recommendations for conservative treatment contradict Dr. Gillard's opinion that Dwayne requires extensive physical limitations. The presence of this "well-supported contradicting evidence" in the record justifies the ALJ's decision to give Dr. Gillard's opinion less than controlling weight and to view it as nothing more than another piece of evidence to consider in his overall analysis. *See Bates*, 736 F.3d at 1099-1100 (internal quotation and citation omitted); *Ray*, 861 Fed. Appx. at 105 (citation omitted).

The remaining opinion evidence in the record is authored by two state agency consultants who examined Dwayne. (A.R. 31.) The ALJ assigned "little weight" to their opinions that Dwayne "can perform work at all exertional levels with only visual limitations" as they "lacked the benefit of reviewing evidence submitted after their review, which reflects greater restrictions." (Id.) For example, the ALJ noted that the consultants did not have access to Dwayne's "referrals to physical therapy for his pain," nor did they have Dwayne's spinal x-ray and MRI and EMG reports. (Id.; see also id. at 76-97 (state agency consultants' opinions which predate the diagnostic imaging reports).) Dwayne argues that the ALJ should have obtained an updated medical opinion from a state agency consultant "rather than rely on his unsupported lay assessment of the various examinations and imaging that post-dated the State agency reviews." (R. 23, Pl.'s Br. at 11.) While "ALJ[s] [are] not

12

*required* to order such examinations," they "may do so if an applicant's medical evidence about a claimed impairment is insufficient." *Skinner v. Astrue*, 478 F.3d 836, 844 (7th Cir. 2007) (emphasis in original). That is not the case here. In addition to detailed medical notes from Dwayne's treating physician and ophthalmologist, the ALJ had the benefit of diagnostic testing interpreted by a neurologist, who recommended conservative treatment. This court thus rejects Dwayne's argument that the ALJ had an obligation to order additional consultative examinations to supplement the medical record. Accordingly, the court concludes that remand is not warranted on this ground.

**C.     RFC Determination**

Dwayne argues that the ALJ's RFC determination was erroneous because the ALJ allegedly: (1) "played doctor" and substituted his own judgment for a medical opinion's guidance; and (2) did not logically bridge the medical record evidence to Dwayne's RFC. (R. 23, Pl.'s Br. at 11-12.) The court rejects both contentions. The RFC measures the tasks a person can perform given limitations based on "all the relevant evidence" in the administrative record. 20 C.F.R. § 404.1545(a)(1); *see also Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). When assessing a claimant's RFC, the ALJ "must give weight to the medical evidence and opinions submitted, unless specific, legitimate reasons constituting good cause are shown for rejecting it." *Chambers v. Saul*, 861 Fed. Appx. 95, 101 (7th Cir. 2021) (quoting *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995)). Where ALJs do not rely upon medical opinions, they must "thoroughly discuss[] the medical and other evidence carefully,"

13

"consider[] each of [the claimant's] impairments and related function deficits," and explicitly "describ[e] how the evidence supports each [RFC] conclusion." *Norris v. Astrue*, 776 F. Supp. 2d 616, 637 (N.D. Ill. 2011) (citing SSR 96-8p); see also *Nina Joyce H. v. Saul*, No. 18 CV 4913, 2020 WL 212771, at *7 (N.D. Ill. Jan. 14, 2020). Finally, an ALJ may not engage in "impermissible cherry-picking" by "highlighting facts that support a finding of non-disability while ignoring evidence to the contrary." *Martin v. Saul*, 950 F.3d 369, 375 (7th Cir. 2020).

Here, the ALJ concluded that Dwayne can perform "medium work" with the following physical limitations:

> [h]e can occasionally reach overhead with a left upper extremity; he can frequently climb ramps and stairs, but can never climb ladders, ropes, and scaffolds; he can never work at unprotected heights, never work around dangerous machinery with moving mechanical parts, and he can never operate a motor vehicle as part of his work-related duties; the claimant is restricted to tasks that only require occasional near visual acuity.

(A.R. 27-28.) Dwayne asserts that the ALJ created an evidentiary deficit by declining to rely on any of the medical opinions submitted and filling the resulting void with his lay opinion. (R. 23, Pl.'s Br. at 11-12.) After defining the RFC, the ALJ summarized Dwayne's hearing testimony, in which he stated that Dwayne "can sit for about ten to fifteen minutes and stand for ten minutes," can "walk a quarter to a half of a block and can lift around twenty pounds comfortably," and "cannot lift his [left] arm above his head for a long time due to a tear in his rotator cuff." (A.R. 28 (citing id. at 63-64).) From there, the ALJ discussed at length the objective medical evidence, including treatment notes from Dwayne's treating physician and ophthalmologist and diagnostic testing interpreted by a neurologist, who

14

recommended conservative treatment. (See id. at 29-30.) The ALJ then explained why this evidence supported the RFC he assessed. (Id.) As such, the court has no concerns that the ALJ improperly substituted his own lay judgment for that of medical experts when crafting Dwayne's RFC. *See Norris*, 776 F. Supp. 2d at 637; *Ronald L. v. Kijakazi*, No. 20 CV 7335, 2021 WL 3689457, at *6 (N.D. Ill. May 26, 2023).

Dwayne next complains that the ALJ did not sufficiently explain why he reached the restrictions he assessed, or why he rejected greater limitations alleged by Dwayne. (R. 23, Pl.'s Br. at 12-13.) The court disagrees. Starting with the latter argument, the ALJ appropriately discounted Dwayne's subjective symptom statements, as explained. As to the former argument, Dwayne seeks to hold the ALJ to a higher standard than the "minimal articulation" required when providing the logical bridge between the evidence and the assessed RFC, as the government correctly points out. (R. 29, Govt.'s Mem. at 4); *see also Butler*, 4 F.4th at 501. In any event, the ALJ adequately explained how "diagnostic imaging and testing, physical examination findings, receipt of conservative treatment, and failure to attend physical therapy or use muscle relaxants," support his conclusion that Dwayne was capable of performing medium work with certain physical limitations despite effects from his impairments, (see R. 29, Govt.'s Mem. at 4). To be sure, the ALJ tied each restriction in the RFC to the applicable impairment(s) and resulting functional limitations based on the record evidence. (A.R. 30.) Remand therefore is not warranted on this ground either.

## Conclusion

For the foregoing reasons, Dwayne's motion is denied and the government's is granted.

**ENTER:**

_____
**Young B. Kim
United State., s Magistrate Judge**